Good morning. This case has two central issues. One under Celotex, when non-movements present evidence that relates to material facts, it needs to be considered, and I don't believe in this case either the lower court or the The second issue is the burden of proof. I believe in the gender plus claim, which starts with gender, it's a motivating factor standard under EADS that has to be applied, and under the retaliation claim, because unlike Nassar, this case involved 2000 E16, it says that federal employees should be free from any discrimination, et cetera, and under Perez-Gomez, we know those phrases include retaliation, and so the . . . The district court said it was free of an illegal motive. The district court said the action was free of an illegal motive. The district court addressed that, did it not? No, I don't believe it discussed it at all. I thought the district court said when the district court was discussing what it had held on the challenged employment action said each action was free from an illegal motive. Am I wrong about that? I don't believe that the court did that. I don't believe it analyzed anything to do that. DE 83 at 38 didn't say that? Well, Your Honor, that may be at that page, but there was no analysis in that order of any evidence that related to that. Yeah, but I'm talking about what the district court found. You said the district court didn't address it. The district court addressed it. It may not have addressed it with the analysis you would have preferred. Here's the problem I have about this. The secretary argued the district court had analyzed Babs' retaliation claims and her agent gender discrimination claims, and it related to the same actions. All of them relate to the same actions by the employer, and argued that the court noted that its retaliation analysis, which it took up first, had already addressed each of the employment actions and demonstrated how each action was free of an illegal motive, end of quote. You responded to that by saying that's not true. The district court didn't do that. You can search through the whole record, and you won't find the phrase free of an illegal motive. The problem I have with that counsel is what the district court actually said, and I searched the record, is free from an illegal motive. It's not a viable argument to say the district court never said it was free of an illegal motive when the district court said it was free from an illegal motive. Your Honor, may I reply by saying this? The district court found a prima facie case of retaliation. Don't take it away from what you said in your brief, which I'm asking you about, and which I find extremely unhelpful and a waste of the court's time. When they argue one thing, you say no, the district court did not say free of an illegal motive, and then we look through the whole record, and we find what the district court said was free from an illegal motive. That's not good lawyering. Not got any more argument? Oh, I have plenty more argument, Your Honor. The district court found that the plaintiff established a prima facie case of retaliation, and it said we didn't show pretext. We didn't show pretext because of the fact that Dr. Williams in geriatrics did not want to perform DSM. But the problem was, Dr. Williams was told that there was one way, pharmacy's way, for DSM to be done. I thought she was offered another position where she could do DSM, and she said, no, this is my life. This is what I've chosen to do. I don't want to do that. She wasn't offered another position at a time when she knew that they were going to take away DSM from the geriatrics. She was ... Yeah, but if you're looking at why they did it, why they took DSM away from geriatrics, if they're doing it to get rid of her, they don't offer her another position in which she can achieve DSM. It doesn't make sense. Wait a minute. They offered her another position in Mod B. She was already doing DSM. She thought she would continue. No one told her she would not do it. I'm not criticizing what she thought and did. I'm saying it doesn't make sense for an employer who wants to get rid of somebody by taking DSM eligibility effectively out of geriatrics to offer her another position where she could have achieved DSM. It doesn't make sense. Your Honor, if you're referring to the so-called June 2012 offer to go to another position, she was already doing GSM at that time. I know. And ... And that may explain why she refused it, but it doesn't explain to me why the employer would have offered her another position where she could have had DSM and where it knew she could have had DSM if it didn't want her to have DSM. Well, did you also notice that Justice, who was the boss of the person that supposedly offered that, said there was never a position available that could have been offered in June of 2012? She testified to that. The bottom line is that they took away an advanced scope, which she had had since 2009, in a position where she needed to use an advanced scope, and she was doing more than 25 percent of her work involved DSM. And that position, that scope was taken away from her in a very unusual way. She wasn't allowed to be in the negotiations. The very next day, they started the process to take it away. The person in charge of advanced scope said, no, that's not the case. Their animus is caught in AIB testimony, where they asked an AIB panel to target Babb because she and two others were complaining about discrimination against older females. AIB was trying to find out what disgruntled employee had sent that message. And of course, of course you say, who are the disgruntled employees that we need to consider as the possible ones who sent that message? What are you going to say? Give me a list of the people who are happiest, who work here. We'll focus on them and see which one of them is the disgruntled employee. That doesn't make any sense, counsel. Well, your honor, I think when people express a willingness to have people targeted because they engage in e- Targeted to determine if they sent a disgruntled employee message. You've got to focus on disgruntled employees. I mean, it's like somebody sent a message. I have been discriminated against because I'm African American. If you were trying to find out who felt like they would have been discriminated against and ask them the source and the origin of that belief, you wouldn't focus on white employees. Your honor, months before that testimony, they were talking in emails about her EEO activity, and they filed a declaration- You're now shifting the argument. I understand that. I'm responding to your argument, which I don't hear a reply to my response, that the AIB board was told to target her. I believe that what's logical is something that a jury in this case should decide. I believe that what people ought to- Even if to the district court and to one of the judges of this council, we haven't talked about this case. I don't know what they feel, but it feels to me like no reasonable juror could find that that is logical. Well, I think when they also know that these people falsely stated when they learned of the EEO activity in a declaration saying it was in May of 2013, when in fact they had the AIB testimony, which expressed this animus in April of 2013, and they had emails going back to January of 2013 where they were discussing EEO activity, including in relation to a position that VAB was applying for. They also admitted, Wilson admitted, that he perceived her to be involved in EEO activity going back to 2012. Can I ask a question just about the targeting aspect? Is it true my notes show that 26 employees were questioned about this, the email? Is that right? It just doesn't sound like targeting to me. 26 sounds like- Well, I don't think all 26 were questioned as targets. The only people that I saw identified in the testimony of the supervisors were people involved in EEO activity. As far as 26 witnesses, there's no evidence that all of them were looked at as targets. When you do an investigation, having been a former federal prosecutor, you talk to lots of witnesses to see who may have heard somebody say something or do something. Having many witnesses is looking into the case. I find it difficult that supervisors can make false statements in a declaration made for litigation, have AIB testimony that expresses a targeting desire based on EEO activity, that has emails that refer to EEO activity, not positively, negatively, that go back to January of 2013, and they admit that they perceived her to be involved in EEO activity in 2012, and Dr. Williams' testimony clearly contradicts the reason the court said, the plaintiff, for finding against retaliation. She found the plaintiff had established all aspects of a retaliation claim, except she couldn't address the reason. Well, the reason was Dr. Williams made us do it, but if you read his testimony, which I quoted extensively in the reply brief, that it is clear that Dr. Williams felt, in a Staub versus Proctor Hospital way, that pharmacy had created the need . . . . . . Counsel, you're running over, but I want to ask you one other thing because it looks to me like it's . . . I can't swear something you said, another thing you said in the brief with what's in the record. Page 16 of your blue brief, Stewart and Truitt's case testified he wanted people who had residency for all positions. The part you cite from that prior case is a question. You also believe that having a residency should be required to be a clinical pharmacist specialist. Answer, I'm not comfortable with you putting words in my mouth based on what I believe. What exactly do you want me to answer? Then the question, that's what I want you to answer what you believe. You believe that it should be required that someone have a residency in order to be a clinical pharmacist specialist, correct? Answer, no. That sounds directly contrary to what you state in the brief he said. There was more to that testimony, Your Honor. Oh, he then said, no, I mean yes? Your Honor, he said . . . You believe that it should be required that someone have a residency in order to be a clinical pharmacist specialist, correct? Answer, no. Your Honor, he left open the . . . 99% of the people that were selected for clinical pharmacy specialists during that testimony, or all the people selected had residency, 99% of the people who do a residency are right out of school. That's not what he said. He said 99% of the group at the medical center. Yes. But, let me tell you this, you didn't say that in your brief, counsel, you said he testified he wanted people who had residency for all the positions. He testified directly, no. I've never seen a brief with more statements that, when I look closely at the record, aren't they ascribed with the record? He wanted it. Do you want it? Should it be required? No. I have a problem with that, and I just wanted you to know it. We'll hear now from Mr. Scholl. Good morning, Your Honors. Peter Scholl on behalf of the Secretary. Judge Carnes, I think, has already seized on the key point in this case. Regardless of how the district court expressed its analysis in its order, it's clear that the court considered all the evidence that the Secretary brought to its attention in the summary judgment motion, all the evidence that Babb brought to the court's attention in its response, and conducted its own independent view of the record. Clearly, on page 38, the reference that the court has been discussing, the court clearly made the finding, or made the determination, that each challenged employment action had been free of an illegal motive. That means that you're not going to die in the ditch of us applying the McDonnell-Douglas but-for pretext analysis, and that you effectively concede that we should be applying a motivating factor analysis, but that you win under that analysis. I think, to a certain extent, it's both, Your Honor. I think, certainly, McDonnell-Douglas applies to the extent that you've got a circumstantial gender discrimination claim. But you can have the motivating factor test applied in appropriate circumstances, but not in a situation where you've got a Title VII retaliation claim or an ADEA claim of any kind. Then you're going to be applying but-for. Even on the public sector side, where the statutes read very differently? Well, no. I think that there are differences on the public sector side, but I think the differences in the statutory language that Mr. Magri is referring to really don't get him to where he wants to be on that point. If Your Honor looks at the statutes, and he's seizing on differences between the public sector provisions, not only in the ADEA, but also in the Title VII public sector provisions, really the argument that she's making is inconsistent with the Supreme Court's decision in Gross and the precise language of the statutes. The private sector provision in the ADEA states that it shall be unlawful for an employer to discriminate because of an employee's age and to retaliate because an employee has engaged in protected activity. But the portions of the ADEA and Title VII that apply to federal employees state that employees shall be free from any discrimination based on a protected characteristic. Now, in Gross, which I cite in the Secretary's brief, the Supreme Court held that the ADEA's private sector provision, which prohibits discrimination because of an employee's age, is governed by a but-for test. In reaching that holding, the Court explained that the phrase based on has exactly the same meaning as the phrase because of. So under Gross's logic, the federal sector provisions in the ADEA and Title VII, which contain the equivalent phrase based on, should be governed by the same but-for test. You don't think that the free from any discrimination gloss that comes before based on broadens the reach of the statute? No, I think that that really is not the operative language in terms of interpreting the two statutes. And I think the Supreme Court, the manner in which the Supreme Court focused on because of and based on in Gross confirms that. And I think that really it may just flow from a quirk in the way Congress wrote the two statutes. One statute is sort of phrased as a positive command, and the other is sort of phrased as a negative prohibition. And as a result, the free from seems to take on a different role in the phrases. But if you step back and look at the fact that in either case, it's describing the conduct that's prohibited, the operative language, particularly in light of the logic and reasoning of the Supreme Court in Gross, is really the based on language, not the free from language. It just seems to me that on the private sector side where it just says because of, it means unitary all of it because of. Here we have free from any discrimination based on. That seems to me like you're sort of parceling things out, and none of these individual threads, if you will, can be based on. That to me does sound like a motivating factor, a lot more than unitary because of. It certainly injects a question into the statutory analysis that wouldn't otherwise exist. But I think if you apply the analysis in Gross, the logic in Gross, the phrases that the Supreme Court is focusing on in Gross, and just the overall assessment of what the statutes are trying to accomplish, is trying to articulate the things that are prohibited, the operative language really does become based on rather than free from. And I do think it comes from the fact that, as I mentioned, Congress has sort of structured the statute a little bit differently in terms of a positive prescription and a negative command in a way that really isn't necessarily intended to change the meaning of the phrase. But I think, so yes, I think I have arguments, and I would disagree with Bab to the extent that she's claiming that the but-for causation standard doesn't apply to Title VII retaliation and Title VII, or I'm sorry, any ADEA claim. But really, my fundamental position on that is that the court really doesn't even need to get there for some of the reasons that Judge Carnes was discussing. Because really what happened here is the court looked at all the evidence and concluded that under the circumstances, even viewing the evidence in the light most favorable to Bab and resolving all reasonable inferences. And that's the key. There's got to be inferences that a rational jury would make. What do you think the biggest failure on the part of Bab is in this case? Well, the biggest failure is to present evidence on which a reasonable and rational jury could determine that the adverse actions in question were motivated by discriminatory or retaliatory animus. In other words, she fails, in your view, on the pretext issue. Yes. But of course, and I led the way into that, but it really doesn't . . . the fact that the district court analyzed stuff is persuasive, but certainly we owe no deference to the de novo determination that we've got to make about whether it was a correct conclusion. Certainly. That's the standard of review. And this court will obviously take its own look at the record on that point. And that's what the district court went off on in the pretext that it did not get to that. No, absolutely. I mean, the court reached the fundamental conclusion that the challenged actions were not motivated, and no rational jury could find that the challenged actions were motivated by a discriminatory and retaliatory animus. And then it went through in much more detail an analysis of each particular challenge action as to why it was reaching that conclusion. Another important thing that I think feeds into the notion that no rational jury on this record could conclude that there was a discriminatory or retaliatory animus, a related point and equally fundamental point is that when this case arose, three different things were going on in the VA. It was implementing a nationwide team-based approach to patient care that made pharmacists who spent at least 25% of their time on it practicing in advanced scopes to be eligible to be promoted. The VA hospital where BAB worked was trying to figure out how to implement that nationwide program. And the managers in the geriatric and pharmacy departments at BAB's hospital were negotiating a new service agreement, and more importantly, having some disagreements about the fundamental philosophical role that a pharmacist should play in the geriatric clinic. Under the new nationwide program and in light of the unique needs of geriatric patients. Sure, managers expressed different views about what the role of pharmacists ought to be, and they expressed different views about how the pharmacists, I'm sorry, about how that nationwide program should be implemented. And that led to a lot of different changes in staffing and at the VA. But really, all of those larger institutional concerns had nothing to do with BAB's or any of the VA's or EEO activity. If we were grading the district court's papers, we couldn't give it an A-plus because of the language about the inquiry is not who's the better candidate for the position, but rather whether the discrepancy is so apparent as to virtually jump off the page and slap you in the face. The Supreme Court slapped us in the face in Ashe and told us that was not very helpful, the visual image. I thought it was a great visual image. I don't think I wrote that particular Ashe, but anyway, they are supreme and we have to quit using that image. Well, sure. If this court is tallying up the score sheet, that would certainly be, the fact that it arguably ought not to have done, but it also cited the correct standard, the reasonable employer standard. And if you look at what the court ultimately decided, what it decided certainly is consistent with if not directly applying the correct reasonable employer standard. So looking back at the institutional concerns that I was talking about a minute ago, for this court to determine that the district court should not have granted summary judgment to the secretary, it would have to conclude that a reasonable jury could have found that when the VA was addressing those larger institutional concerns, management's desire to discriminate or retaliate against BAB sort of became the tail that was wagging the dog on all those larger institutional concerns. It also would have to conclude that management put its desire to discriminate and retaliate against BAB ahead of the needs of patients because many of the decisions that it was making, whether it was in the context of the larger nationwide program or in the context of any particular decision about who should be doing what job and when, really that boils down to the interest of patients at that bottom. Can I ask you one question? Sure. Sorry if I'm hung up on the proper statutory analysis here or the test under the statute. Let's assume that I think as a matter of first principles that motivating factor is the proper analysis on the public sector side. What do you think, and I'll ask your opponent when he stands back up as well, what do we do with, this is the new judge asking the question, but what do we do with our opinion in, what's it called, TRASC, where we seem to apply a but-for standard in a public sector lawsuit, but without really any real recognition of the different language in the two statutes? Does TRASC nonetheless control our decision about the proper test? Well, certainly TRASC is the only decision that I was able to find that does that. The court has done that in a number of other unpublished decisions as well. I believe that that issue is an issue that was raised for the first time in the reply brief in the TRASC case. So although we argue that TRASC is controlling authority, and it certainly should inform this court's judgment, I think in terms of its analysis and its pure holding, it may not well get there in terms of it being a controlling authority in that respect. You're assuming that an overlooked reason or argument not made undermines the prior precedent? You're right. I will just tell you this. We have so many prior precedents saying that is not and cannot be law, because otherwise a prior precedent rule would mean little, because you can always think of some argument that they didn't address and use it as an excuse. Right. And that's why I think I acknowledge that it may well not be binding. But I think ultimately, at the end of the day, you really still have, in this particular case, because the record supports the district court's conclusion that the challenge decisions were entirely free of any discriminatory or retaliatory animus, any discussion of that issue and that argument by Babb really becomes an academic question that really isn't presented this case, and the court doesn't need to get there. The same is true of the argument on the fact that the Nassar but-for standard of causation should apply to the Title VII retaliation and ADEA claims. That fundamental finding, which again, is fully supported by the record, and really Babb has not identified any evidence that would lead a rational jury to conclude otherwise, that makes it unnecessary to consider that issue as well. Because even under the less demanding motivating factor test in Quigg, the Secretary would still be entitled to summary judgment. Just so I'm clear, you all don't have any regulations on the standard, do you? For some reason I recall from a prior case that there actually are regulations on the private sector side that sort of help to flesh out the standard, but there are no regulations on the public sector. I don't know the answer to that question. Fine. It's fine. One final point that the court spent some time with opposing counsel on, the whole notion of the Administrative Investigation Board and to what extent the certain managers were giving false statements when they explained when they were aware of Babb's prior EEO claim. Really, all the evidence that Babb is referring to there talks about some emails in which we're aware that there's this unhappy group of people out there who think that what we're doing is motivated by an unlawful, discriminatory, or retaliatory animus, we need to be careful. The fact that a manager is aware that an employee or a group of employees feels a certain way or is particularly sensitive to a particular issue, and the fact that management might make an effort to tread carefully there, that doesn't make the management's decisions, whatever they decide to do, motivated by discriminatory animus. So... Well, there's certainly some temporal proximity because all these things were happening within roughly the same time period. It's kind of hard to know exactly what the temporal proximity is in any particular event unless you sort of tease it out and look at it individually because this was sort of a rolling situation where everything was tumbling over one another during this whole time period. So the bottom line is I think the district court's determination regarding the fact that no reasonable jury could have come to a conclusion that there was a discriminatory or retaliatory animus is the key point. And in order to get to the conclusion that that was wrong, this court would really have to be second-guessing in a way that its numerous decisions would make clear is not appropriate. So... I'm sorry, go ahead. Can I ask you, this is really a point of curiosity I'm almost afraid to ask, but can you tell me what a maumau is? I cannot. The witnesses who testified about it explained their understanding of it, but I don't know what... I thought the evidence from which a jury could infer that the meaning was clear, which was a Cajun grandmother or Cajun for a grandmother, a maumau. I was not aware of that, the Cajun inference, but in any event, so unless the court has further questions, I'll submit on my comments today and the arguments in the brief. Thank you. Magra, five minutes. There are decisions by the EEOC and numerous decisions by the EEOC on federal employees that the A factor, they treat it as a motivating factor standard, applies to federal employees. The MSPB, which is the old civil service board, which sometimes decides EEO cases and it also decides whistleblower cases, but I've cited the Savage case where they decided both an EEOC and a whistleblower case and they used the free from all, meaning A factor. They followed, they agreed with the DC circuit's decision on that point. If we're going to read statutes and make laws based on statutes, we have to do that here because it is very different than 2000E3. Let me just ask you this. I actually think that's the easy part of your argument. The harder part of your argument is circling back to Chief Judge Karn's question about page 38 of the district court opinion, which may well suggest that you lose even under my reading of the statute. All right. I strongly disagree for the reason I started this argument. There are numerous facts that has been presented in this case that show discriminatory animus. None of those were analyzed. The one key thing that I would like the court to look at when they're considering that argument is look at her finding that the plaintiff established a prima facie case and then the very first reason she gives, which is free from discrimination apparently, which I don't believe she really analyzed it that way, is the Williams reason. You cannot read Dr. Williams' testimony and find that he did not want Babb to have a DSM. That's what they wanted. It's just when you're dealing with older vets, you have to deal with their comorbidities, both from the military and their age, so you have to approach those things a little differently. The approach that the pharmacy took here is actually contrary to the approach that the VA central office takes. But the main thing is Dr. Williams wanted to continue with Babb doing DSM. He just wanted her to be available to consult with the physicians on some of the hard cases because she was really good at it. And what pharmacy was setting up was a way where she couldn't do it and they couldn't do it. He wouldn't agree to that. They told him it was all DSM or nothing, and as a result, he said, well, and they also told him, when you look at that testimony, they also told him that it would be bad for Babb if they went and did it the way he wanted to do it. The theory there was that she wouldn't meet a 25% threshold of work in order to get the GS13. However, the evidence is clearly in dispute on that issue, and if you look at his testimony, he's talking about giving her three hours a day. How could that not be 25%? But in any event, that's not important. There was a bunch of litigation about the 25%. Three different efforts by the VA to show she wasn't getting it. The first she shot down, after discovery ended, they gave us 1,200 new pages of evidence, which Justice then argued showed she didn't meet it. She shot that down. So Justice, in the reply brief, I think it is, but don't hold me to that, Judge Karn, she did it at some point. I understand, and I practiced a long time, I've never had been told what I've been told today. I apologize for that. Let me help you out a little bit. Your client was the one who gave the evidence that Momo, she thought was Cajun for grandmother because her sister-in-law from New Orleans, that's what she goes by. I think it's Meemaw, but in reality, and I also think that Mau Mau is a term that was used in Africa in relation to certain, if you look it up, I think you will find that it was used to refer to certain, I don't want to say native, but yes. Maybe so, but if you do what we tell jurors not to do and Google it, it comes up as Cajun. Yes, I understand, but the thing is, I didn't address that in this brief, but the fact of the matter is, I know that there's a more hostile meaning to that term, but the point here is, you can't look at William's testimony and find any evidence to support a free-from determination, and that then affects all the other parts of her decision. Thank you. Okay. We appreciate it, and we'll take that case under submission, and we are now Brett Benner versus . . .